Estate of L. B. Mann, R. S. Mann and E. K. Mann, Executors v. Commissioner.
Estate of L. B. Mann v. Commissioner
Docket No. 21567.
United States Tax Court
1951 Tax Ct. Memo LEXIS 6; 10 T.C.M. (CCH) 1235; T.C.M. (RIA) 51377; December 28, 1951
*6 The decedent, at three different times after the age of 74 years, pursuant to promises made and long established plan, transferred properties to his children, in two out of three instances at practically the same time as the drafting of wills. Held, under all of the facts, that his controlling motive in making the transfers was associated with life, and was not contemplation of death. He also, when about 82 years of age, made a gift to a granddaughter to equalize previous gifts to her brothers and to take the place of a gift he had expected her father to make, and executed a codicil to his will referring to the gift as an "advancement." Held, on the facts, that the transfer to the granddaughter was in contemplation of death. Alex P. Gaines, Esq., 1015 William-Oliver Bldg., Atlanta 3, Ga., for the petitioner. Newman A. Townsend, Jr., Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves a deficiency of $63,066.23 in estate tax. The issue remaining for decision is whether certain transfers of property, the value of which is not in dispute, were made in contemplation of death. The facts set forth in *7 the stipulations of the parties are found as agreed upon therein. Portions thereof which we consider necessary for consideration of the issue will be incorporated in connection with facts from other evidence. Findings of Fact The petitioners are the duly qualified executors of the estate of L. B. Mann, deceased, who was born on October 2, 1860, and died January 31, 1946, a resident of Newnan, Coweta County, Georgia. The estate tax return was filed with the collector for the district of Georgia. The tax of $3,150.74 shown on the return was paid. The decedent, whose formal schooling did not extend beyond the third grade of grammar school, began to earn his own livelihood as a farmer in Meriwether County, Georgia. He was married and was the father of five children, namely, Leroy, Augusta, Robert S., Emil K., and Mary, born in 1888, 1890, 1894, 1900 and 1902, respectively, all of whom survived the decedent except Leroy who died February 19, 1943. Decedent's wife died November 5, 1940. Decedent moved to Newnan, Georgia, about 1903 and lived there the remainder of his life. Until 1918 the principal interest of the decedent was the operation of his farms. In 1918 the decedent organized *8 a business to manufacture hosiery under the name of Newman Hosiery Mills with Leroy as his first assistant. At that time Robert was in the military service in France. After Robert's return to the United States in 1920, the decedent and Leroy, Robert and Emil formed a partnership to operate the business with a capital of $80,000, all of which was furnished by the decedent, and in which their interests were one-half, three-sixteenths, and one-eighth, respectively. The sons gave the decedent notes for the full amount of their respective interests, all of which were subsequently paid. The original interest continued until January 1, 1926, when the decedent sold one-eighth of his interest to Emil. Decedent was known as "president" of the business; Leroy was general supervisor of the mill under the decedent; Robert did office work and supervised the finishing department and Emil had charge of dyeing and performed other duties. The partnership agreement provided that any member of the partnership who desired to sell his interest, or any part thereof, should first offer it for sale to other members at the same price, that the person to whom the sale was proposed should be acceptable to the *9 other partners and that the person acquiring the interest should agree to be bound by the partnership agreement. The decedent was the active head of the business and determined its policies. During the early part of 1926 the partnership commenced and in June 1927 completed the construction of a new mill building at a cost of about $100,000. The books of the partnership disclose that the decedent loaned a total of $60,000 to the partnership between February 1926 and July 11, 1927. On July 11, 1927, the business of the partnership was incorporated under the same name, hereinafter referred to as the corporation, with a capital of $220,000, consisting of 1,600 shares of common and 600 shares of 6 per cent cumulative preferred stock, each share of the par value of $100. The decedent subscribed for 700 shares of the corporation's common stock and each of his sons subscribed for 300 shares. On the same day the corporation agreed to issue its common stock to the subscribers for the assets of the partnership and assume its liabilities. The liabilities assumed consisted of the debt of $60,000 to the decedent and $96,077.77 in bank loans. Of the stock issued for the net assets, 650 shares *10 were issued to the decedent, 300 to each of the three sons and 50 shares to J. A. Camp, the superintendent of the mill, out of the subscription of the decedent, on his agreement to sell the stock to the decedent in the event he severed his employment with the corporation. All of the preferred stock of the corporation was issued to the decedent for a cancellation of its indebtedness of $60,000 to him. At the request of the decedent, the common stock was issued to him in three certificates of 216 shares each and one certificate for 2 shares, and the preferred stock in two certificates of 300 shares each. The decedent informed Robert at that time that he expected to give the common stock to him, Leroy, and Emil when he was ready to turn the mill over to them, and that he was going to give the preferred stock to his daughters. At some undisclosed time thereafter, decedent placed the preferred stock certificates in his safe deposit box with a memorandum attached thereto reciting that he intended to give the stock to his daughters. The bank loans assumed by the corporation were paid out of a bond issue in the amount of $100,000. The bonds were retired in 1936, in connection with which *11 the corporation borrowed $25,000 from a bank and a like amount from decedent, who subordinated his note to the bank obligation. The decedent endorsed the note given by the corporation for the bank loan and as collateral deposited with the bank the note given him by the corporation. The last payment on the bank loan was made about 1938 and decedent's note was repaid by 1941. In the early part of 1939 the bank granted a request of decedent that he be relieved of a blanket guaranty he had given it to pay notes given by the corporation for loans. With the exception of the loan made in 1936, decedent did not act as endorser of obligations of the corporation after 1935. The decedent, Leroy, Robert and Emil were elected president, vice president, secretary and treasurer, respectively, of the corporation. By re-elections from year to year they held the same offices until January 31, 1946, except that on January 5, 1937, Robert was made second vice president, and James Mann, son of Leroy, was made secretary, and upon the death of Leroy in 1943, Robert was elected vice president. The corporation was liquidated in 1950. The corporation was compelled to borrow money from time to time to finance *12 its operations. During the years 1930, 1932, 1933 and 1934 it borrowed a total of $38,500 from the decedent, all of which was repaid by July 1935. The corporation purchased additional machinery from 1927 to 1933, inclusive, at a total cost of $117,200. Prior to 1935, while decedent was its principal executive, the financial condition of the corporation improved progressively. Its operation as a whole had been successful, sales increased and mill property improved. Dividends on the preferred stock were paid each year through 1945, except in 1928 when only one-half of the amount was paid. The unpaid dividend in that year was paid in 1931. No dividend was paid on the common stock in the years 1927 to 1935, inclusive, 1937, 1938 and 1940. Dividends were paid in other years as follows: 1936
$24,000
1939
8,000
1941
8,000
1942
22,400
1943
$24,000
1944
24,000
1945
24,000
In February 1935 decedent acquired the 50 shares of common stock held by Camp. The shares were reissued to the decedent in four certificates, two of which were for 17 shares each, one for 15 shares and one for one share. Decedent was especially devoted to his daughters and did not want *13 them to marry. They were living with decedent in 1925. Augusta was engaged on two occasions but decedent persuaded her to break the engagements. She never married and continued to live with the decedent until his death. At Christmas 1925 decedent gave to each of his daughters a slip of paper upon which he had written the following: "$30,000.00 stocks and bonds, Manufacturers National Bank," and told them that the slip represented securities and that he was making the gifts to make them financially independent so that they would not have to marry for security. At that time he informed his sons and thereafter told his family doctor and a banker that he intended to give his sons his interest in the mill when he believed they were able to manage the business. He wished to have more time to devote to the operation of his farms. No securities were delivered to the daughters at the time the slips were delivered but the decedent was financially able to make a gift of $60,000. Decedent did not actually deliver any stock to his daughters until 1938. About the time of the gifts of slips of paper in 1925 decedent endeavored to frustrate a budding romance Mary was having with Harry M. Boon, *14 a dentistry student, who was in debt for college expenses. Decedent was aware of the debts and considered them to be an additional reason for opposing the marriage of his daughter to Boon. In the fall of 1926, Mary and Boon informed decedent that they expected to be married about Christmas of that year, to which he remarked, "Well, that's Mary's funeral." They were married December 21, 1926, and promptly thereafter established a residence in a rented apartment in Atlanta, Georgia, where Boon was associated with another dentist. Knowledge that Mary was living in an apartment, instead of a house, irritated decedent. Decedent preferred that they live in a house. About 1927 he had a home built for them in Atlanta, in connection with which he obtained a note from Mary for an amount in excess of $13,000 at 6 per cent interest, without the consent or knowledge of her husband, and into which home Mary and her husband moved after it was completed. The interest was paid on the note for two or three months. Upon learning of the giving of the note by his wife, Boon informed decedent by letter that he thought decedent had made a gift of the house to his wife, that he was not financially able to *15 and resented being forced to, in effect, borrow money at 6 per cent interest and that, speaking only for himself, "he could have the house on any short notice." Decedent did not reply to the letter. Later when Boon discussed the matter with decedent, the latter acknowledged that Boon was right in objecting to the transaction and refunded the interest with interest. The decedent canceled the note about 1934. Boon established his own dental office in 1930. He financed the purchase of equipment for his office out a bank loan of $6,000 secured by bonds borrowed from his brothers-in-law for that purpose. The last payment on the loan was made by Boon on February 23, 1938, of which Boon advised decedent on the same day. The information pleased decedent very much. About 1935 the decedent informed his doctor that he wanted his daughters to have their own money and that he had provided for them so that they would not be dependent upon anyone at his death and that he intended to do the same things for his sons when they demonstrated to him that they could operate the mill and knew what to do with money. About February 15, 1935, the decedent informed his banker that he had become convinced *16 that his sons could operate the mill and desired to fulfill the promise he had made to give his stock to them. On that day the certificates the decedent held for 216 shares each of common stock were transferred by him to his sons, one certificate to each son. None of the decedent's sons was in financial difficulty at that time. On the same day the decedent informed Robert that he intended to give some property to Mary and Augusta. At that time Robert and Leroy had no appreciable income other than from the corporation. Decedent transferred the common, instead of preferred, stock to his sons because they had the ability lacked by his daughters to manage the mill. In February 1935 decedent informed his wife and Augusta that he intended to convey to them his residence in Newnan and an adjoining lot improved by a cottage. On July 26, 1935, he executed and delivered to Augusta a deed in which he conveyed the property to them jointly with right of survivorship. The deed was witnessed by J. H. Hall and Beatrice B. Gentry and was recorded July 13, 1939. Decedent's intention was that Boon should not obtain any of his property. Boon's practice of dentistry was successful after he opened his *17 own office. By 1935, when decedent realized that Boon was succeeding as a dentist and was paying his debts and that Mary was being well provided for, decedent began to like him and eventually became very fond of him. On July 27, 1935, decedent executed a deed in which he conveyed the Atlanta property to Mary "for and during her natural life, and at her death to such child or children as she may leave surviving her and to the representative of any deceased child or children." The witnesses to the deed were J. H. Hall, a law partner of R. O. Jones, Newnan, Georgia, and Beatrice B. Gentry, a stenographer in their office. The deed was filed for record on October 11, 1935. On July 26, 1935, R. O. Jones drafted a will for decedent in accordance with his instructions. The instrument, as drafted, bequeathed one-sixth of decedent's estate to his wife for her life or during widowhood and his residuary estate equally among his five children, except that his sons were to receive his stock of the corporation. The shares, in his estate bequeathed to the sons, were to be theirs absolutely. The share bequeathed to each daughter was upon her death to go to her children, if living, and if deceased, *18 to their descendents, and, if none, the share was to revert to decedent's estate, provided, however, that if a husband survived a daughter, living at his death, onehalf of the income of her share was to be paid to him for a period of one year from the time of her death. The decedent removed the draft of will from the attorney's office without signing it. The document was not found among the papers of decedent after his death. A notation reading, "Old will Superseded," was made by Jones on his office copy of the document after he drafted the last will of decedent in 1938. The transfers of real estate and stock to decedent's wife and children were reported in a gift tax return filed for 1935. The property in each transfer was reported at a value of $8,640. The return was prepared by Robert who understood that his father had made all of the transfers on February 15, 1935. The decedent instructed Robert to include each transfer in the return at a value of $8,640. The certificate held by the decedent for one share of common stock was transferred to J. L. Mann, a son of Leroy, in 1937. The decedent continued to hold the remaining 51 shares until his death. On March 7, 1938, the decedent *19 transferred and delivered to the transferees 300 shares of preferred stock of the corporation to Augusta and 100 shares each to Mary and her two children and told Augusta and Mary it would not be necessary for them to retain the slips of paper any longer since the preferred stock was being given to them instead of the securities mentioned in the slips. After making the gifts decedent discontinued the monthly allowance he had previously made to Augusta and made no further gifts to her and Mary except when making gifts of small equal amounts to all members of the family. Thereafter annual dividends on the stock were paid to the daughters. The decedent filed a gift tax return for 1938 in which he reported the transfers at a total value of $60,000. Augusta did not have a safe deposit box until some undisclosed time after the gift of preferred stock to her in 1938. She put the deed for the real property and certificates for the preferred stock in an envelope, which she placed in a safe deposit box in the vault at the hosiery mill. The stock certificates remained in that depository until their removal in 1950 for surrender in connection with the liquidation of the corporation. The certificates *20 issued to Mary and her children for preferred stock were at some undisclosed time placed in Mary's safe deposit box in Atlanta. The decedent executed his last will and testament on March 7, 1938. The will bequeathed one-sixth of his estate to his wife for life or during widowhood and at her death or remarriage the property was to revert to his estate for distribution in accordance with Item Five of the instrument. The will directed that certain lands be retained and managed by his executors for a period of 20 years, [1] when they were to be sold, and the proceeds of sale, together with any accumulations of profit from operation, distributed per capita among his living descendants. Item Five directed that his residuary estate be divided equally among his five children, in conection with which the sons were to receive his stock of the corporation and the daughters were to receive out of his securities an amount equal to the share each son received out of the stock. Until 1938 decedent paid all of the living expenses of Augusta and gave her an allowance of $50 per month. He continued to pay her household expenses after *21 1938 but discontinued the monthly allowance. Decedent gave Mary an allowance of $50 per month until her marriage. Decedent felt that continuation of the allowance to Mary after her marriage might result in discord in his family. Thereafter at irregular times he made small gifts to her, which she considered to be interest on the securities mentioned on the slip of paper handed to her at Christmas 1925. It was a practice of decedent to make small gifts of cash to members of his family and grandchildren. The gifts were always in equal amounts. Leroy died intestate suddenly and unexpectedly. Prior thereto the decedent had given farms to Leroy's two sons and Leroy contemplated, and did not make, an equal gift of money to his daughter Elsie. On February 21, 1943, two days after the death of Leroy, decedent informed Elsie that he would make a gift to her of $5,000, as an amount equal to the value of the farms he had given each of her two brothers. On March 9, 1943, he gave Elsie 100 shares of common stock of the Citizens & Southern National Bank and 50 shares of common stock of the First National Bank of Atlanta. In January 1944 he gave her Series E United States bonds of the face amount *22 of $1,987.50 and cash in the amount of $12.50. The gifts were made in separate years to avoid a gift in one year of a value in excess of $3,000. On March 17, 1943, the decedent executed a codicil to his last will, which, after referring to the gift of $5,000 to Elsie, provided that the amount of the gift be charged as an advancement on the share distributable to Leroy and that decedent's children, then living, each receive $5,000 from his residuary estate before it was distributed as provided in Item Five of the will, Elsie, however, to share equally with her brothers in the estate distributable to all of the children of Leroy. Each year decedent and his sons were paid equal salaries by the corporation. The salaries paid each ranged from $6,000, paid in 1934, 1935 and 1940, to $12,000 paid in the years 1942 to 1945, inclusive. After 1935 the decedent visited the offices of the corporation almost every day, during the course of which he would inquire about business matters, including the purchase of yarn and supplies, inventories, whether money should be borrowed for additional equipment and labor problems, which interest continued until his death. The sons sought decedent's *23 advice on business affairs of the corporation but he did no detail work and no longer determined business policies. He had a desk at the office and handled some correspondence of the corporation. In 1935 and until 1938 decedent owned from 600 to 800 acres of farm land. At the time of his death, decedent owned 2,170 acres of timber and other land in Coweta County, Georgia. The decedent was interested in farming and took an active interest in his farms. The decedent was a man of personal integrity and strong convictions. He neither smoked nor drank liquor. His wants were simple and he lived on a modest scale. He was a man of few words and seldom discussed his affairs with anyone. After the decedent made up his mind it was difficult to persuade him to change it. He was a good but stern parent and he expected his children to obey him. They seldom did things contrary to his wishes. He showed no favoritism among his children and often expressed an intention to have them share equally in his property. The decedent had always been in remarkably good health for a man of his years. He had prostate gland operations about 1920 and 1941. His physician informed him after the second operation *24 that the condition was not malignant. At the times he made the gifts in 1935, 1938, 1943, and 1944 decedent was in excellent health and had not had any serious illness immediately prior thereto. During the last few years of his life he was active and made daily trips to his farms, was extremely found of cards and played checkers with old friends during afternoons. On his 85th birthday decedent had a good appetite, was jolly and told his guests at a party that he would see them the next year. Decedent never discussed with his sons, bankers or doctor his will, estate taxes or the possibility of death. In 1945 he was making plans for the future. In 1944 and 1945 he was considering remarriage and the establishment of a new home and discussed the matter with his children. On one occasion during that period he proposed marriage but was refused. The decedent wished to keep himself in good physical condition, and to do so, consulted his physician occasionally after 1927 for physical examinations. Decedent was not at any time after about 1927 suffering from high or low blood pressure. He was conscious of blood pressure and frequently had his physician examine his blood pressure, during *25 the last five years of his life at least every month. He began to develop micardia insufficiency about six months before his death. The decedent became ill with bronchopneumonia in January 1946 and died about fifteen days later of hypostatic pneumonia. In his determination of the deficiency the respondent held that the transfers made by the decedent in 1935, 1938, 1943 and 1944 were made in contemplation of death. The transfers which the decedent made to his children and to the daughters of Mary were not made in contemplation of his death. The transfers to his granddaughter Elsie were made by him in contemplation of his death. Opinion The tests for determining whether the transfers were made in contemplation of death are set forth in . In that case the Court said that the dominant purpose of the statute is to "reach substitutes for testamentary dispositions" and the "motive which induces the transfer must be of the sort that leads to testamentary disposition." "Thought of death" must be the impelling cause or controlling motive. Gifts made from a different motive are not within the statute. ; *26 . The motive inducing the transfers is a question of fact to be determined from consideration of all of the pertinent evidence. Respondent's view, particularly as to the transfers made in 1935 and 1938, is that they were part of a general testamentary plan of decedent to dispose of his estate to his natural heirs and, therefore, substitutes for testamentary distributions. Petitioner's broad contention is that decedent's motives for the transfers were associated with life and therefore were not made in contemplation of death. The transfers of common stock to the sons in 1935 and preferred stock to the daughters and grandchildren in 1938 stem from facts having much in common and will first be considered. Respondent concedes that decedent enjoyed very good health for a man of his age, a concession inescapable from the evidence. We find nothing in the facts to warrant a finding that the decedent at any time important was actuated to make the transfers by thoughts of impending death due to physical disabilities. He frequently sought advice of his physician and was conscious of blood pressure, but the medical services were not *27 in connection with any chronic illness such as might cause an individual to be unduly concerned about premature death. Nothing suggests that the decedent gave any more consideration to death than knowledge all have that it is inevitable. However, individuals enjoying the best of health, regardless of age, and without any apprehension of immediate death may contemplate death when making transfers and the point is not controlling, being only a factor to be taken into account in arriving at the decedent's motive for the transfers. The dominant motive for the transfers of stock appears free of doubt. The sons had been associated with decedent in the hosiery manufacturing business and a natural desire on his part would be to have them eventually acquire his holdings of common stock to give them complete control of management and operation. His determination in that regard was made known to the sons as early as Christmas 1925 and was never changed. The time to put it into effect was to be gauged by their ability to acquire knowledge, sufficient in his judgment, for successful operation of the business. The time was reached in 1935. In the meantime, others became aware of decedent's intention, *28 and the common stock since the organization of the corporation in 1927 was held in certificates for equal division among the sons. The desire of decedent was that his daughters not marry. In an effort to eliminate security for them as a consideration for marriage, he gave his daughters the slips of paper in 1925 to indicate gifts to each of securities of a value of $30,000. Prior to 1938 the certificates for the preferred stock, 300 shares each, had been in decedent's safe deposit box with memoranda attached to them which, with the remarks he made to members of his family and others about his purpose, disclose intention over a long period to give the stock to his daughters. Preferred stock was selected for the daughters because they would not possess knowledge required to operate the business as owners of common stock. There is a direct connection between the slips of paper delivered in 1925 and the gifts of preferred stock in 1938. The par value of the stock and the value placed upon the securities in decedent's return for the gifts was the same as the amount shown on the slips as a gift and, upon delivery of the stock, decedent informed his daughters that the stock was in lieu *29 of the securities mentioned in the slips. Thus, it is apparent that the preferred stock, like the common, was intended by decedent for many years to be made the subject of gifts to his children. The fact that 100 shares of the 300 shares intended for a gift to Mary were transferred to each of two of her children does not materially affect the original intention of the decedent, for it is obvious that it was merely a division on his part of the gift he at all times since 1925 intended to make to their mother. Decedent informed his wife and Augusta about the time in February 1935 when he transferred the stock to his sons, of his intention to give them a deed to the family residence and an adjoining improved lot. The deed was executed on July 26, 1935 and the next day he executed a deed in which he conveyed the Atlanta property to Mary for life, with remainders over to her children. At that time decedent had counsel draft a will for him but no proof was made that he signed it. His last will was executed the day he transferred the preferred stock. Respondent refers to the preparation and execution of wills about the time of, or concurrently with, the transfers as strong evidence *30 of a motive to sustain his action. The acts of decedent in that regard are significant but not controlling. ; . Decedent was especially opposed to the marriage of Mary to Boon and wished to prevent him from obtaining any of his property. Boon and his family had been living in the Atlanta house with the consent of decedent since its erection about 1927. Such interest as Mary, without her husband's knowledge, paid for a few months on the note she gave decedent was refunded and the note was canceled about 1934. About that time decedent was aware that Boon was successfully practicing his profession in an office of his own and some of his bitterness towards his son-in-law had disappeared. Later, apparently in 1938 when Boon paid the bank loan he made to equip his office, it turned to fondness. Thus, by 1935 and 1938 hatred or dislike for Boon was no longer a serious factor for refraining from making a gift to Mary out of which her husband would derive direct or indirect financial benefit. In February 1935, when making the gifts of stock to his sons, decedent informed Robert of his intention *31 to make a gift of property to Mary and Augusta and during the same month he told his wife and Augusta that he intended to convey the homestead and adjoining property to them. A gift to one of the daughters only would not have been in line with decedent's practice of making equal gifts to his children. Equal gifts [2] were necessary to comply with his policy. The gift to Augusta tended to make Augusta feel that she had security without marriage. The attitude of decedent on marriage of his daughters and equal treatment for them was manifested in the document prepared in 1935 as a will and his last will, executed in 1938. Provision was made in the first document for the sons to receive equal shares, which were to include decedent's stock of the corporation, absolutely, while the daughters were to receive only life interests in their shares. Surviving sons-in-law received nothing except as a survivor of a daughter living at his death, in which event he was to receive for one year one-half of the income from her share. Decedent's last will executed in 1938 bequeathed his residuary estate in fee simple equally *32 among his children and proceeds to be realized from farm lands after specified period of operation, among all living descendents per capita. Thus, the wills (assuming the document drafted in 1935 was signed by decedent) were capable of being administered without reference to the prior gifts of stock and real property. There is weight in the respondent's argument that testamentary disposition is indicated by the fact of a will being drafted dated July 6, 1935, the day of transfer of the house, also adjoining property, to decedent's wife and to Augusta jointly with right of survivorship, and a deed on July 27 to Mary covering her home, and the will executed March 7, 1938, the day of his transfer of the perferred stock to Augusta, and Mary and her children. The fact that the first will may not have been executed we deem immaterial. Its contents were determined by the decedent and his views thereby indicated. Had the determination to make gifts and wills been at substantially the same time, and particularly if as in some cases the language used was largely the same in both, very strong indication of testamentary intent, in the gifts, would appear. But we think there is in logic a great *33 difference if the gifts, though made at the same dates as wills, were merely the activation of previous and long-standing intent, in fact promise so to give. In that case the reasonable view appears to be that the will does not reflect the testamentary intent of the maker therein, into the intention as to the long previously determined and promised gift, but is merely supplemental thereto, indicating testamentary intent only as to property not covered by the earlier promise. Such appears to us to be the situation here. Though we by no means agree with the petitioner that wills and gifts merely happened to be at practically the same time, July 6, 1935 and March 7, 1938, for obviously there was connection, yet we think that the wills were, so to speak, only ancillary to the consummation of the gifts, which had long before been determined upon. In short, we take the view that the wills do not indicate that the primary intent, impelling cause, or controlling motive of decedent in making the transfers was contemplation of death, under the cases on this subject - except as below discussed with reference to the gift to Elsie. Further discussion of the facts is unnecessary. Consideration *34 of all of the evidence establishes, in our opinion, and we hold, that the transfers of stock and real property in 1935 and 1938 were not made in contemplation of death. The gifts in 1943 and 1944 to Elsie, a daughter of Leroy, have a different setting. Leroy, who died suddenly on February 19, 1943, during his lifetime contemplated a gift to her to equalize gifts of farms decedent had made at undisclosed times to his two sons. Within a few days after his son's death, decedent informed Elsie of his intention to make a gift to her of $5,000. The gift of stock was made March 9, 1943, and the bonds and cash in January 1944, gifts in different years having been decided upon to avoid gift tax. On March 17, 1943, decedent executed a codicil to his last will, in which he provided that the gifts to Elsie be treated as an advancement on the share distributable to Leroy. Petitioner's contention on these transfers is that decedent's impelling motive was to fulfill a promise of his deceased son and that it was prompted by Leroy's death and, therefore, not thoughts of decedent's death. Respondent regards the transfers as substitutes for testamentary dispositions. As proof of the fact respondent *35 refers especially to Leroy's untimely death with the effects it had on decedent's outlook on life at his, decedent's, advanced age at that time and the promptness with which he acted after Leroy's death, including alterations of his will. In our view, the transfers to Elsie were under all circumstances substitutes for testamentary disposition. Though connected in a broad way with the earlier gifts to Leroy and the decedents' general purpose of making gifts to his children with intent which we have found associated with life rather than in contemplation of death, it is obvious that the gifts to Elsie were much more closely associated to testamentary disposition than was true in 1935 and 1938 as to the other gifts. The codicil to decedent's will definitely provided that the gift of $5,000 be charged as an advancement on the share of decedent's estate distributable to Leroy. In short, the situation is not different in essence than if decedent had made a gift to Leroy and by codicil provided that it be charged against his share of the estate as provided under the will. The connection is, not with the earlier gifts to Leroy, which we have above held not to be testamentary in nature, but *36 with his share of decedent's estate as provided under his will, which of course is of testamentary nature. The only other connection is with gifts decedent had made to Leroy's sons. It is clear that the decedent in making the gift of $5,000 to Elsie in effect debited it against the provisions he had set up in his will, for Leroy. We take the fact of the codicil and provision as to "advancement," with all other circumstances, into consideration in determining the controlling motive which actuated decedent in making the gift. Under all the facts we conclude that the decedent was primarily motivated by thoughts of his death in making the gifts to Elsie, and that to the extent thereof estate tax was properly determined. The parties have stipulated that petitioner is entitled to a deduction of $750 for attorneys' fees and an additional amount to be reflected in the recomputation under Rule 50 for attorney's fees incident to this proceeding. Decision will be entered under Rule 50. Footnotes
1. Reduced to 10 years by codicil executed January 25, 1943.↩
2. His gift tax return shows that he considered them to be of equal value.↩